## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ESTATE OF JOSEPH MAGLIOLI, BERNARD MAGLIOLI, DANTE MAGLIOLI, AND ESTATE OF DALE AND PETRY CHRISTOPHER PETRY,**<br><br>   **Plaintiffs,**<br><br>v.<br><br>**ANDOVER SUBACUTE REHABILITATION CENTER I; ANDOVER SUBACUTE REHABILITATION CENTER II; ALTITUDE HEALTH SERVICES INC.; ALTITUDE INVESTMENTS, LTD; ALLIANCE HEALTHCARE; CHAIM "MUTTY" SCHEINBAUM; LOUIS SCHWARTZ; JOHN AND JANE DOES 1-10; AND ABC AND XYZ CORPORATIONS 1-10,**<br><br>   **Defendants.** | Civ. No. 20-6605 (KM)(ESK)<br><br>Civ. No. 20-6985 (KM)(ESK)<br><br>**OPINION** |
| **ESTATE OF WANDA KAEGI AND VICTOR KAEGI, ESTATE OF STEPHEN BLAINE AND SHARON FARRELL,**<br><br>   **Plaintiffs,**<br><br>v.<br><br>**ANDOVER SUBACUTE REHABILITATION CENTER I; ANDOVER SUBACUTE REHABILITATION CENTER II; ALTITUDE HEALTH SERVICES INC.; ALTITUDE INVESTMENTS, LTD; ALLIANCE HEALTHCARE; CHAIM "MUTTY" SCHEINBAUM; LOUIS SCHWARTZ; JOHN AND JANE DOES 1-10; AND ABC AND XYZ CORPORATIONS 1-10,**<br><br>   **Defendants.** | |

1

**KEVIN MCNULTY, U.S.D.J.:**

This case, irrespective of fault, is a sad one. These related actions assert state-law claims of negligence, wrongful death, and medical malpractice on behalf of residents and patients at Defendants' nursing care facilities. Plaintiffs filed these actions in New Jersey state court. Defendants then removed the actions under 28 U.S.C. §§ 1441 and 1442, primarily asserting that Plaintiffs' claims were preempted by the Public Readiness and Emergency Preparedness ("PREP") Act, and secondarily asserting that Defendants were entitled to a federal forum as "federal officers" or the equivalent. Plaintiffs have now moved to remand. (6605 Action, DE 6, DE 7; 6985 Action, DE 5, DE 6)

For the reasons explained in this opinion, I will grant Plaintiffs' motions to remand the case to their chosen state forum.

## I.    Summary[1]

The facts alleged in this recently-filed complaints are assumed to be true for present purposes. They have not, of course, been tested by any fact finder.

### A.    The parties

The allegations of the complaints arise from the treatment of residents at two nursing facilities in Andover, New Jersey. "Defendant Andover Subacute Rehabilitation Center I is located at: 1 Obrien Lane, Lafayette Township, NJ 07848." (6605 2AC ¶ 3) "Defendant Andover Subacute Rehabilitation Center II is located at:  99 Mulford Road, Lafayette Township, New Jersey 07848." (*Id.* ¶

---

[1]    Citations to the record will be abbreviated as follows. Citations to page numbers refer to the page numbers assigned through the Electronic Court Filing system, unless otherwise indicated:

"DE" = Docket entry number in this case.

"6605 2AC" = The Second Amended Complaint filed by Plaintiffs in 20-cv-6605. (DE 1-1)

"6985 AC" = The Amended Complaint filed by Plaintiffs in 20-cv-6985. (DE 1-1)

"6605 Action" = The 2:20-cv-6605-KM-ESK Action.

"6985 Action" = The 2:20-cv-6985-KM-ESK Action.

4) "Defendant Alliance Healthcare is a New Jersey domiciled company, with a business address at:1382 Lanes Mill Road, Lakewood, New Jersey 08701, USA, and is owned and/or operated by Defendant Chaim 'Mutty' Scheinbaum and Defendant Louis Schwartz." (*Id.* ¶ 6)

Plaintiffs were all residents or patients at Defendants' facilities and died while in their care, allegedly as a result of Defendants' failure to exercise due care with respect to coronavirus infections. (*Id.* ¶ 2)

### B.   COVID-19

Beginning in 2019, the virus now known as COVID-19 began spreading throughout the world. In January 2020, Defendants learned of the virus. (*Id.* ¶ 9) In February 2020, news reports reflected that residents at a healthcare facility in Washington State became infected with the virus and several residents died. (*Id.* ¶ 11)

By now, the virus, the resulting pandemic, and the tragic consequences, particularly for persons in close quarters like nursing homes, are familiar to all. COVID-19 is an acute respiratory disease caused by the SARS-CoV-2 betacoronavirus or a virus mutating therefrom. The COVID-19 virus can be transmitted even by persons who display no symptoms. It spreads "mainly through close contact [within about six feet] from person-to-person in respiratory droplets" and from contact with contaminated surfaces. *See* Ctrs. for Disease Control and Prevention, How to Protect Yourself & Others, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited July 20, 2020). To thwart the spread of the illness, the Centers for Disease Control and Prevention ("CDC") recommend social distancing (staying at least six feet away from others), wearing cloth face coverings when around others, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other practices. *Id.* Obviously, however, the "the best way to prevent illness is to avoid being exposed to this virus." *Id.* There are treatments, but currently there

is no vaccine or cure. Persons with certain chronic underlying medical conditions are at a greater risk of being affected by COVID-19. (6605 2AC ¶ 10)

### C.    Outbreak at the Andover Centers

On March 26, 2020, the Andover Centers fell victim to a COVID-19 outbreak. (*Id.* ¶ 12) Nevertheless, Plaintiffs allege, "Defendants failed to take the proper steps to protect the residents and/or patients at their facilities from the Covid-19 virus." (*Id.* ¶ 13) Management, say Plaintiffs, at first provided only a limited number of masks to employees of the facilities, restricting them to the registered nurses. (*Id.* ¶ 14) Meanwhile, others who interacted with residents and patients, such as housekeepers, therapists, and nursing assistants, were not provided masks. (*Id.*)

Plaintiffs more generally allege, however, that Defendants are liable for failing to observe a wide range of appropriate safety precautions, specifically:

> failing to monitor outside visitors to the facilities, failing to monitor food preparation and distribution, failing to monitor employees, and failing to monitor other residents, etc., when the same were dealing with the residents and/or patients at the facilities in order to prevent the spread of the Covid-19 virus therein; furthermore, said Defendants breached their duty to Wanda Kaegi, Stephen Blaine and the residents and/or patients at the Andover Subacute Rehabilitation Centers I and II by failing to have (or implement) proper protocols and procedures, and/or failing to have or provide personal protective equipment, in place for the prevention of the spread of the Covid-19 virus, and/or by failing to properly execute existing protocols and procedures set in place to prevent the spread of the Covid-19 virus.

(*See, e.g.*, 6985 AC ¶¶ 28, 32, 36; *see also* 6605 2AC ¶¶ 28, 32, 36)

Joseph Maglioli died on April 9, 2020, and Dale Petry died on April 15, 2020, both from COVID-19 infections. (*Id.* ¶ 15) Wanda Kaegi died on May 2, 2020 and Stephen Blaine died on April 11, 2020, both from COVID-19 infections. (6985 AC ¶ 15) The complaints allege that at least 50 other patients were infected at the Andover facilities and died as a result of COVID-19. (6605 2AC ¶ 16; 6985 AC ¶ 16) Plaintiffs attribute all of these deaths to the Andover facilities' failure to take proper protective measures. (*Id.* ¶ 17)

The complaints assert the following claims:

**Count 1**: Negligence – Wrongful death as to all known Defendants

**Count 2**: Negligence – Wrongful death as to all fictitious Defendants who remain unknown.

**Count 3**: Negligence – Medical Malpractice as to all unknown doctors, nurses, and medical professionals licensed in New Jersey who treated Plaintiffs.

**Count 4**: Negligence as proximate cause of incident/injury

**Count 5**: Punitive Damages

### D.    Procedural History

On May 19, 2020, Plaintiffs filed their complaints in the Superior Court of New Jersey, Law Division, Sussex County. A week later, on May 26, 2020, Plaintiffs filed amended complaints in both actions.[2]

On May 29, 2020, Defendants filed a notice of removal of the 6605 Action and on June 9, 2019, Defendants filed a notice of removal of the 6985 Action. Both notices of removal recited that the complaints alleged medical negligence for failure to protect plaintiffs from COVID-19 because Defendants did not properly administer and utilize personal protective equipment. The complaints do not in so many words set forth a federal-law cause of action. Nevertheless, say Defendants, this Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action is preempted by a federal statute, namely the Public Readiness and Emergency Preparedness Act, 42 U.S.C. §§ 247d-6d, 247d-6e(2006) as modified by the Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15198 (Mar. 17, 2020) (together, for convenience, the "PREP Act"). (6605 Action, DE 1 at 3-4) Defendants removed the actions on the basis that the PREP Act "provides liability protections for pandemic and epidemic products and security countermeasures," including "respiratory protective devices." Defendants state that they are "covered

---

[2]     Plaintiffs in the 6605 Action filed an Amended Complaint and a Second Amended Complaint on the same day, May 26, 2020. (*See* 6605 Dkt. at DE 1-1)

persons" under the PREP Act and that such "a 'covered person' shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure' during a health emergency. 42 U.S.C. § 247d–6d(a)(1)." (*Id.* at 4-5)

Defendants also removed the actions under 28 U.S.C. § 1442(a)(1) because "'(1) Defendants are 'persons' within the meaning of the statute; (2) the Plaintiffs' claims are based upon Defendants' conduct 'acting under' the United States, its agencies, or its officers; (3) the Plaintiffs' claims are 'for, or relating to' an act under color of federal office; and (4) Defendants raise a colorable federal defense to the Plaintiff's claims.'" (DE 1 at 7 (citing *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016)))

On June 12, 2010, Plaintiffs filed motions to remand these matters to state court. (6605 Action, DE 6, DE 7; 6985 Action, DE 5, DE 6) Defendants oppose the motions. (6605 Action, DE 8; 6985 Action, DE 7)

On July 23, 2020, Plaintiffs filed a stipulation of dismissal as to the Altitude Defendants, which I so-ordered. (6605, DE 10, DE 12; 6985, DE 9, DE 10)

## II.   Discussion

### A.   Removal under § 1441

#### i.   Legal Standard

A defendant may remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). District courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (concerning federal question jurisdiction).[3]

---

[3]      Jurisdiction is not claimed under 28 U.S.C. § 1332, and it does not appear from the allegations that plaintiffs and defendants are of diverse state citizenship. All references to federal subject matter jurisdiction in this opinion are to federal-question, or arising-under, jurisdiction under 28 U.S.C. § 1331.

A party's right to remove a civil action is "determined according to the plaintiff's pleading at the time of the petition for the removal." *Pullman Co. v. Jenkins*, 305 U.S. 534, 537, 59 S. Ct. 347 (1939). "[A] subsequent amendment to the complaint after removal designed to eliminate the federal claim will not defeat federal jurisdiction." *Seawright v. Greenberg*, 233 F. App'x 145, 148 (3d Cir. 2007). Nevertheless, a removed action must be remanded (just as any federal action must be dismissed) "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). Removal is "strictly construed, with all doubts to be resolved in favor of remand." *Brown v. JEVIC*, 575 F.3d 322, 326 (3d Cir. 2009) (citations omitted); *see also Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 396, 403 (3d Cir. 2004) (citations omitted). The removing party bears the burden of showing that removal is appropriate. *See Frederico v. Home Depot*, 507 F.3d 188, 193 (3d Cir. 2007).

The "well-pleaded complaint" rule dictates that a plaintiff is ordinarily entitled to its chosen state-court forum so long as its complaint does not allege a federal claim on its face. *Dukes v. U.S. Healthcare*, 57 F.3d 350, 353 (3d Cir. 1995) (citing *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 27-28, 103 S. Ct. 2841 (1983) ("[A] defendant may not remove a case to federal court unless the plaintiff's complaint establishes that the case arises under federal law."), *superseded by statute*, 28 U.S.C. § 1441); *see also Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."). A party bringing a claim is "the master of the claim," and as such, "may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar*, 482 U.S. at 392.

Complete or "field" preemption, however, is an exception to the well-pleaded complaint rule. "Congress may so completely preempt a particular area, that any civil complaint raising this select group of claims is necessarily

7

federal in character. For 20 years, this Court has singled out claims pre-
empted by § 301 of LMRA for such special treatment." *Metro. Life Ins. Co. v.
Taylor*, 481 U.S. 58, 63-64 (1987); *see also Caterpillar Inc.*, 482 U.S. at 393
("Once an area of state law has been completely pre-empted, any claim
purportedly based on that pre-empted state law is considered, from its
inception, a federal claim, and therefore arises under federal law." (citations
and quotation marks omitted)).

### ii.  PREP Act

Defendants invoke the Public Readiness and Emergency Preparedness
Act.

> [The PREP Act] authorizes the Secretary of Health and Human
> Services (the Secretary) to issue a Declaration to provide liability
> immunity to certain individuals and entities (Covered Persons)
> against any claim of loss caused by, arising out of, relating to, or
> resulting from the manufacture, distribution, administration, or
> use of medical countermeasures (Covered Countermeasures),
> except for claims involving "willful misconduct" as defined in the
> PREP Act. Under the PREP Act, a Declaration may be amended as
> circumstances warrant.
>
> The PREP Act was enacted on December 30, 2005, as Public
> Law 109–148, Division C, Section 2. It amended the Public Health
> Service (PHS) Act, adding Section 319F–3, which addresses liability
> immunity, and Section 319F–4, which creates a compensation
> program. These sections are codified at 42 U.S.C. 247d–6d and 42
> U.S.C. 247d–6e, respectively.

85 Fed. Reg. 21,012 (April 15, 2020).

The background provisions of the PREP Act state the following with
respect to such liability protections:

> Subject to the other provisions of this section, a covered person
> shall be immune from suit and liability under Federal and State
> law with respect to all claims for loss caused by, arising out of,
> relating to, or resulting from the administration to or the use by an
> individual of a covered countermeasure if a declaration under
> subsection (b) has been issued with respect to such
> countermeasure.

42 U.S.C. § 247d-6d(a)(1).

8

In March 2020, however, the Secretary of the Department of Health and Human Services ("HHS") published several such "declaration[s] under subsection (b)." These were designed to provide immunity from liability for certain activities related to medical countermeasures against the ongoing COVID-19 pandemic. By declaration dated March 10, 2020, the definition of a "covered countermeasure" was expanded to include

> any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID–19, or the transmission of SARS-CoV–2 or a virus mutating therefrom, or any device used in the administration of any such product, and all components and constituent materials of any such product.

85 Fed. Reg. 15,198, 15,202 (March 17, 2020). Additional declarations in March 2020 further expanded the definition of "countermeasures":

> The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law 116–136 was enacted on March 27, 2020. The CARES Act amended section 319F–3(i)(1)(D) of the PHS Act, first added by the Families First Coronavirus Response Act, Public Law 116–127 on March 18, 2020. These amendments created a new category of covered countermeasures eligible for liability immunity under the PREP Act, namely, respiratory protective devices approved by the National Institute for Occupational Safety and Health (NIOSH) under 42 CFR part 84, or any successor regulations, that the Secretary determines to be a priority for use during a public health emergency declared under section 319 of the PHS Act.

> . . .

> The Secretary is amending the March 10, 2020 Declaration under the PREP Act to extend liability immunity to covered countermeasures authorized under the CARES Act. This amendment is made in accordance with section 319F–3 of the PHS Act, which authorizes the Secretary to amend a PREP Act declaration at any time.

> . . .

> As amended by the CARES Act, the PREP Act states that a "Covered Countermeasure" must be a "qualified pandemic or epidemic product," a "security countermeasure," a drug, biological

> product, or device authorized for emergency use in accordance
> with sections 564, 564A, or 564B of the Federal Food, Drug, and
> Cosmetic (FD&C) Act, or a respiratory protective device approved
> by NIOSH under 42 CFR part 84, or any successor regulations,
> that the Secretary determines to be a priority for use during a
> public health emergency declared under section 319 of the PHS
> Act. Accordingly, in Section VI of the Declaration, the Secretary is
> amending the list of medical countermeasures against COVID–19
> that are covered countermeasures under the declaration to include
> covered countermeasures authorized by the CARES Act, namely
> respiratory protective devices approved by NIOSH under 42 CFR
> part 84, or any successor regulations, that the Secretary
> determines to be a priority for use during a public health
> emergency declared under section 319 of the PHS Act.

85 Fed. Reg. 21,012, 21,013; *see also* 42 U.S.C. §§ 247d, 247d-6d(i)(1)(D)("[A]

respiratory protective device that is approved by the National Institute for

Occupational Safety and Health under part 84 of title 42, Code of Federal

Regulations (or any successor regulations), and that the Secretary determines

to be a priority for use during a public health emergency declared under

section 247d of this title.").[4]

A few more definitions are pertinent.

A "person" is defined to "include[] an individual, partnership,

corporation, association, entity, or public or private corporation, including a

Federal, State, or local government agency or department." 42 U.S.C. § 247d-

6d(i)(5). A "program planner" means

> a State or local government, including an Indian tribe, a person
> employed by the State or local government, or other person who
> supervised or administered a program with respect to the
> administration, dispensing, distribution, provision, or use of a
> security countermeasure or a qualified pandemic or epidemic
> product, including a person who has established requirements,
> provided policy guidance, or supplied technical or scientific advice
> or assistance or provides a facility to administer or use a covered
> countermeasure in accordance with a declaration under
> subsection (b).

---

[4]      These provisions went into effect in March and will remain in effect until the
final day of the emergency declaration or October 1, 2024. 85 Fed. Reg. 21,012,
21,014.

*Id.* § 247d-6d(i)(6).

The PREP Act defines the term "covered person," "when used with respect to the administration or use of a covered countermeasure," to mean

> (A) the United States; or
>
> (B) a person or entity that is--
>
>> (i) a manufacturer of such countermeasure;
>>
>> (ii) a distributor of such countermeasure;
>>
>> (iii) a program planner of such countermeasure;
>>
>> (iv) a qualified person who prescribed, administered, or dispensed such countermeasure; or
>>
>> (v) an official, agent, or employee of a person or entity described in clause (i), (ii), (iii), or (iv).

*Id.* § 247d-6d(i)(2).

A "qualified person" "when used with respect to the administration or use of a covered countermeasure" is defined as

> (A) a licensed health professional or other individual who is authorized to prescribe, administer, or dispense such countermeasures under the law of the State in which the countermeasure was prescribed, administered, or dispensed; or
>
> (B) a person within a category of persons so identified in a declaration by the Secretary under subsection (b).

*Id.* § 247d-6d(i)(8).

"Administration" is undefined in the PREP Act, but the Act enables the Secretary of HHS to further outline relevant conditions. Recently, the Secretary clarified that definition:

> Administration of a Covered Countermeasure means physical provision of the countermeasures to recipients, or activities and decisions directly relating to public and private delivery, distribution, and dispensing of the countermeasures to recipients; management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures.

*See* https://www.phe.gov/Preparedness/legal/prepact/Pages/COVID19.aspx.[5] Even the seemingly broader category of "decisions directly *relating*" to the countermeasures, within the meaning of this definition, is bound to the "physical provision of the countermeasures to recipients," or "relating to public and private delivery, distribution and dispensing of the countermeasures to recipients, management and operation of countermeasure programs, or management and operation of locations for purpose of distributing and dispensing countermeasures." *Id.*

---

[5]   The Secretary's declaration further states as follows:

The definition of "administration" extends only to physical provision of a countermeasure to a recipient, such as vaccination or handing drugs to patients, and to activities related to management and operation of programs and locations for providing countermeasures to recipients, such as decisions and actions involving security and queuing, but only insofar as those activities directly relate to the countermeasure activities. Claims for which Covered Persons are provided immunity under the Act are losses caused by, arising out of, relating to, or resulting from the administration to or use by an individual of a Covered Countermeasure consistent with the terms of a Declaration issued under the Act. ***Under the definition, these liability claims are precluded if they allege an injury caused by a countermeasure, or if the claims are due to manufacture, delivery, distribution, dispensing, or management and operation of countermeasure programs at distribution and dispensing sites***.

Thus, it is the Secretary's interpretation that, when a Declaration is in effect, the Act precludes, for example, liability claims alleging negligence by a manufacturer in creating a vaccine, or negligence by a health care provider in prescribing the wrong dose, absent willful misconduct. Likewise, the Act precludes a liability claim relating to the management and operation of a countermeasure distribution program or site, such as a slip-and-fall injury or vehicle collision by a recipient receiving a countermeasure at a retail store serving as an administration or dispensing location that alleges, for example, lax security or chaotic crowd control. However, a liability claim alleging an injury occurring at the site that was not directly related to the countermeasure activities is not covered, such as a slip and fall with no direct connection to the countermeasure's administration or use.  In each case, whether immunity is applicable will depend on the particular facts and circumstances.

*Id.* (emphasis added). The guidance is general in that its examples tend to identify only the clear cases at either end of the spectrum—*i.e.,* those obviously immune (actual administration of countermeasures to a patient) and those obviously not immune (a slip and fall at a medical facility). The rest are relegated to an assessment of "particular facts and circumstances."

Finally, Section 247d-6d does contain an explicit provision regarding preemption, though it does not apply here:

> During the effective period of a declaration under subsection (b), or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that—
>
> > (A) is different from, or is in conflict with, any requirement applicable under this section; and
> >
> > (B) relates to the design, development, clinical testing or investigation, formulation, manufacture, distribution, sale, donation, purchase, marketing, promotion, packaging, labeling, licensing, use, any other aspect of safety or efficacy, or the prescribing, dispensing, or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section or any other provision of this chapter, or under the Federal Food, Drug, and Cosmetic.

42 U.S.C. § 247d-6d(b)(8). As discussed herein, this provision pertains to a form of preemption, "conflict preemption," but does not by itself mandate a federal forum or completely preempt all claims arising out of the adequacy, or not, of the medical care afforded by these defendants when infected with the COVID-19 virus.

### iii.  Analysis

There is no question that the COVID-19 pandemic has required a coordinated effort between federal, state, and municipal governments. Long-term care facilities, such as the nursing facilities at issue here, have in one sense borne the tragic cost of this virus. In another sense, they have been on the front lines of combating this deadly disease and providing necessary care, at great personal risk, to those particularly susceptible to the virus. One question here is whether the PREP Act and its immunities are so broad as to cover these state-law negligence claims against the providers of such care. Another is whether, even assuming the PREP Act limits the scope of what

plaintiffs may sue for, it completely preempts all such claims and requires that they be given a federal forum.

A court must first look to the plain language of a statute in determining its meaning, and often must look no farther. *United States v. Gregg*, 226 F.3d 253, 257 (3d Cir. 2000); *United States v. Gollapudi*, 130 F.3d 66, 70 (3d Cir. 1997). "If the language of the statute expresses Congress's intent with sufficient precision, the inquiry ends there and the statute is enforced according to its terms." *Gregg*, 226 F.3d at 257; *see also Barrios v. Att'y Gen.*, 399 F.3d 272, 277 n.11 (3d Cir. 2005). The plain language may be set aside only if strict application would produce an absurd result, one that is clearly contrary to legislative intent. *See id.*; *see also Gollapudi*, 130 F.3d at 70 ("Only the most extraordinary showing of contrary intentions in the legislative history will justify a departure from that language." (internal quotation marks and brackets omitted)). Statutes should, if possible, be construed to function as a "harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Thus, "[c]ourts should disfavor interpretations of statutes that render language superfluous." Conn. *Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992); *see also TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

The PREP Act provides immunity for a covered person against claims of loss caused by or relating to the manufacture, distribution, administration, or use of medical countermeasures. Plaintiffs contend that Defendants do not fall within the scope of the PREP Act, in that the claims are not directed against Defendants' role in the manufacturing, distribution, administration, or use of a covered countermeasure. (6605 Action, DE 6-1 at 12-13) Defendants respond that the negligence claims here fall within the PREP Act, because they do "originate[] and arise[] from Defendants' allocation, use, distribution, procurement and administration of various 'covered countermeasures' in responding to, mitigating, or otherwise preventing the transmission of the COVID-19 virus, including, but not limited to, PPE." (6605 Action, DE 8 at 11)

14

My view of the matter is closer to that of Plaintiffs. The PREP Act, as amended, is an emergency response to the pandemic. Its evident purpose is to embolden caregivers, permitting them to administer certain encouraged forms of care (listed COVID "countermeasures") with the assurance that they will not face liability for having done so. Nothing in the language of the Act suggests that it was intended to more broadly displace state-law causes of action for, e.g., malpractice or substandard care—even if proper care possibly *would* have entailed administration of such countermeasures.

I start with the question of preemption. In general, preemption takes three forms:

> (1) "express" preemption, applicable when Congress expressly states its intent to preempt state law; (2) "field" preemption, applicable when "Congress' intent to pre-empt all state law in a particular area may be inferred [because] the scheme of federal regulation is sufficiently comprehensive" or "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject;" and (3) "conflict" preemption, applicable when "state law is nullified to the extent that it actually conflicts with federal law," even though Congress has not displaced all state law in a given area.

*Fellner v. Tri–Union Seafoods, L.L.C.*, 539 F.3d 237, 242–43 (3d Cir. 2008).

Two types of preemption potentially apply to Plaintiffs' claims. Field, or implied, preemption applies when federal law "so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Orson, Inc. v. Miramax Film Corp.*, 189 F.3d 377, 381 (3d Cir. 1999) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)) (internal quotation marks omitted). State law may also be displaced under conflict preemption when the state law in questions presents a conflict with federal law either because "it is impossible to comply with both the state and the federal law" or "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 382 (internal citations omitted).

15

The largely unstated premise of the Defendants' argument is that if the PREP Act applies in any manner, they are entitled to a federal-court forum by virtue of field preemption. That is by no means clear; to say that federal law applies in some manner is not to say that the case must be heard in federal court. Ordinarily, under the well-pleaded complaint rule, a federal-law defense to liability does not require that a state-law case be removed to federal court.[6] The PREP Act does not so provide, and it is not the source of the Plaintiffs' claims. Defendants cite 42 U.S.C. § 247d-6d(e)(1)—a subsection of the very PREP Act provision involved here—which provides that "[a]ny action under subsection (d) shall be filed and maintained only in the United States District Court for the District of Columbia." To me, that demonstrates only that Congress knew very well how to provide for an exclusive federal forum when it wanted to—*i.e.,* for actions under subsection (d), which this is not.

---

[6]     As a point of comparison, Section 301 of the LMRA explicitly grants federal courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185. The Supreme Court has held that "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). Thus, "LMRA § 301 completely preempts a state cause of action ... when the resolution of said action is 'substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract.'" *Id.* at 220.

The PREP Act does not contain language mandating a federal forum. Nor does its language completely displace state law as to all matters touching on the COVID-19 pandemic. Indeed, the Act contains a limited preemption clause, suggesting that Congress thought about how far preemption should go, and drew the line well short of what Defendants are proposing here. Only claims related to the administration of designing, manufacturing, and distributing covered countermeasures to individuals is preempted. That is, "no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that . . . (A) is different from, or is in conflict with, any requirement applicable under this section; and (B) relates to the design, development. . . manufacture, distribution, sale, donation, purchase, marketing, promotion, packaging, labeling, licensing, use, any other aspect of safety or efficacy, or the prescribing, dispensing, or administration by qualified persons of the covered countermeasure. . . ." 42 U.S.C. § 247d-6d(b)(8).

16

Moreover, even if I accept that the PREP Act does contain an express provision regarding preemption, *see* 42 U.S.C. § 247d-6d(b)(8), at most this provision restricts any state from passing a law that conflicts with the federal government's requirements for the "design, development, clinical testing or investigation, formulation, manufacture, distribution, sale, donation, purchase, marketing, promotion, packaging, labeling, licensing, use, any other aspect of safety or efficacy, or the prescribing, dispensing, or administration" of covered countermeasures. *Id.* But, Plaintiffs acknowledge that they are not suing Defendants for any act taken in conformity with these protected acts vis-à-vis countermeasures.

Defendants do not deny that the PREP Act and its "COVID-19 directives were designed to maximize the availability of PPE and testing for those who needed it most, including specific instructions as to how to administer and preserve PPE." (6605 Action, DE 8 at 16) That this is the very purpose of the PREP Act is confirmed by the statute's plain language. Section 247d-6d covers "all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure." "The immunity under paragraph (1) applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure." *Id.* § 247d-6d(a)(2)(B).

Here, declarations under subsection (b) were concededly issued. These cover the manufacturing, distribution, and administration of "qualified pandemic" products and respiratory protective devices. The Act, as extended by the declarations, therefore covers the administration and distribution of products meant to curb the spread of COVID-19. It does not, by its plain terms, cover more generally the care received by patients in healthcare facilities.

Suppose, for example, a facility was threatened with or subjected to an outbreak of COVID-19 and the physicians in charge made a decision to do nothing. In the broadest sense, this decision would relate to countermeasures, in the sense that it embodied a decision *not* to employ them. Assuming that such a decision lay outside the realm of reasonable medical judgments, it could give rise to a malpractice claim. And such a malpractice claim would not be preempted by the PREP Act, which is designed to protect those who employ countermeasures, not those who decline to employ them.

Such an interpretation of the PREP Act is consistent with guidance from the Secretary of HHS, who declared that "the Act precludes, for example, liability claims alleging negligence by a manufacturer in creating a vaccine, or negligence by a health care provider in prescribing the wrong dose, absent willful misconduct." https://www.phe.gov/Preparedness/legal/prepact/Pages/COVID19.aspx. The Secretary's interpretation is a useful guide to the PREP Act's purpose as perceived by those who have been charged with the authority to issue declarations and implement the Act.

All of the foregoing provisions concerning the scope of the PREP Act suggest that it does not "occupy the field" of negligence or malpractice claims, even if that negligence or malpractice happens to relate to the COVID-19 illness. Its effect is confined, for example, to the administration of certain countermeasures, and requires case by case analysis. In short, I think the PREP Act limits the range of what the plaintiff can sue for—whether in state or federal court—but does not rule out all such claims. Plaintiffs, in pursuing their claims in state court, may find that their claims are confined by those limitations. I believe, however, that the Act still leaves room for ordinary claims of negligent or substandard care. The allegations of the complaints fit that description, and Plaintiffs acknowledge that that is the nature of the claims.

Defendants rely heavily on *Parker v. St. Lawrence Cty. Pub. Health Dep't*, 102 A.D.3d 140 (3d Dep't App. Div. 2012), but that case is distinguishable. (*See* 6605 Action, DE 8 at 13-15) In *Parker*, "in response to an outbreak of the

18

H1N1 influenza virus, the Secretary determined that a public health emergency existed and issued declarations recommending the administration of the influenza antiviral vaccination." *Id.* at 141. Thereafter, the parents of a minor brought a negligence action against a school district who administered the vaccination without their permission. *Id.* In finding that the PREP Act preempted plaintiff's claims, the court stated that "immunity provisions of the PREP Act are triggered where, as here, the vaccines are purchased pursuant to a federal contract or agreement" and because administering the vaccine was explicitly defined in the PREP Act as a covered countermeasure. *Id.* at 142–43.

Here, by contrast, the complaints do not allege that Plaintiffs' injuries arose from, *e.g.,* Defendants' administration to them of vaccines or medicines (or for that matter protective gear)—activities that the PREP Act promotes by affording immunity. Nor do Plaintiffs run afoul of conflict preemption by seeking a state law ruling requiring what federal law prohibits, or prohibiting what federal law promotes. Indeed, Plaintiffs are claiming (*inter alia*) that the Defendants committed negligence in that, among other things, they *failed* to take countermeasures, some of them allegedly federally required. Whether that is true must await fact finding, but that is the claim. Plaintiffs thus assert that—because of those failures and other, *see infra*—the quality of the care they received fell short of what a nursing home facility should have done to protect them from infection by the coronavirus. Such claims concerning the quality of care do not fall within the scope of the PREP Act.

That interpretation has support by negative implication. In recognition that the PREP Act does not cover the kinds of claims asserted here, many states have filled the gap with executive orders that provide for such immunity. Indeed, New Jersey is among those states:

> Any healthcare facility, within the meaning of N.J.S.A. 26:13-2, any modular field treatment facility, and any other site designated by the Commissioner of the Department of Health for temporary use for the purpose of providing essential services in support of the State's COVID-19 response, including hotels and student dormitories, shall be immune from civil liability for any damages alleged to have been sustained as a

> result of *an act or omission undertaken in good faith in the course of providing services in support of the State's COVID-19 response* by one or more of its agents, officers, employees, servants, representatives or volunteers, if, and to the extent, such agent, officer, employee, servant, representative or volunteer is immune from liability, whether or not such immunity is otherwise available under current law. Such immunity shall not extend to acts or omissions that constitute a crime, actual fraud, actual malice, gross negligence or willful misconduct.

Exec. Order 112, https://nj.gov/infobank/eo/056murphy/pdf/EO-112.pdf (emphasis added). The New Jersey Executive order thus provides an instructive contrast. The drafters of the PREP Act, if they had meant to cover any negligent act or omission "in the course of" providing COVID-related health care, could easily have done so. The language of the federal Act, however, is far narrower. This, too, suggests that Plaintiffs' claims of negligence in connection with caring for these nursing home residents do not fall within the preemptive scope of the PREP Act.

I have referred to alleged acts of negligence, including failure to take the countermeasures enumerated in the PREP Act, "and others." By that, I mean that many of the measures with which Defendants allegedly failed to comply were acts such as "social distancing, quarantining, lockdowns, and others." (6055 Action, DE 8 at 16) These are not covered "countermeasures" under the PREP Act at all. Any claim that Defendants failed to comply with them is not within the scope of the Act, which covers "qualified pandemic or epidemic products"—products including "a drug (as such term is defined in section 201(g)(1) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321(g)(1)), biological product (as such term is defined by section 262(i) of this title), or device (as such term is defined by section 201(h) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. 321(h))." 42 U.S.C. § 247d-6d(i)(7). Practices such as social distancing are not covered by the Act. These claims would not fall within its preemptive scope and mandate a federal forum. And more broadly, the availability of such measures, assuming they go beyond federal requirements, do not give rise to conflict preemption. Nothing in the PREP Act suggests a

legislative intent to prohibit the states from imposing higher or additional measures through the case by case operation of negligence law.

I pause to state what I am not deciding. I do not rule that the Defendants are, or are not, entitled to a PREP Act defense to this or that claim. That is for the state courts to decide on remand. What I am deciding is that the PREP Act does not so occupy the field as to squeeze out state court jurisdiction over what are state-law claims of negligence and require an exclusive federal forum. Consequently, I find that removal was improper under 42 U.S.C. § 1441 and would grant the motion to remand on that basis.

### B.   Removal under § 1442(a)(1)

Alternatively, however, Defendants argue that removal under Section 1442(a)(1) was also warranted. They argue that their response to the coronavirus pandemic, alleged by Plaintiffs to have been insufficient, was part of a national response effort to curb the spread of COVID-19, and it complied with federal guidelines. Defendants point out in addition, that they are heavily regulated by Medicare guidelines in exchange for Medicare and Medicaid funds. (DE 8 at 24-34) For all these reasons, say Defendants, they enjoy the status of agents of the United States, who are entitled to a federal forum for claims against them. (DE 8 at 30) For the reasons outlined below, I disagree and will remand.

### i. Legal Standard

Section 1442(a) provides as follows:

(a) A civil action ... that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

> (1) The United States or any agency thereof ... for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the ... collection of the revenue.

....

(d) In this section, the following definitions apply:

> (1) The terms "civil action" and "criminal prosecution" include any proceeding (whether or not ancillary to another proceeding) to the extent that in such proceeding a judicial order, including a subpoena for testimony or documents, is sought or issued. If removal is sought for a proceeding described in the previous sentence, and there is no other basis for removal, only that proceeding may be removed to the district court.

28 U.S.C. § 1442.[7]

"Section 1442(a) is an exception to the well-pleaded complaint rule, under which (absent diversity) a defendant may not remove a case to federal court unless the plaintiff's complaint establishes that the case arises under federal law." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) (quotation and citation omitted). Under this section, "a colorable federal defense is sufficient to confer federal jurisdiction." *Id.*

The Third Circuit draws a distinction between removal under § 1441, which is "to be strictly construed against removal and all doubts should be resolved in favor of remand," *Boyer v. Snap–On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) (quotation and citation omitted), and § 1442(a), which is to be "broadly construed." *Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1262 (3d Cir. 1994); *See In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d at 467. Still, "[that] broad language is not limitless. And a liberal construction nonetheless can find limits

---

[7]    Section 1442, often referred to as the "federal officer removal statute," has been twice amended, first in 1996 and a second time in 2011. I note briefly that in 1996, Congress amended § 1442(a)(1) to allow for removal by "the United States or any agency thereof." Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 206, 110 Stat. 3847, 3850 (codified as amended at 28 U.S.C. § 1442). Before 1996, removal was limited to "[a]ny officer of the United States or any agency thereof, or person acting under him, for any act under color of such office." The 1996 amendment explicitly reversed *International Primate Protection League v. Administrators of the Tulane Education Fund*, 500 U.S. 72, 79-87 (1991), wherein the Supreme Court held that federal agencies were not entitled to removal under the statute.

in a text's language, context, history, and purposes." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

In order to establish a proper basis for removal under § 1442, the removing party must show that "(1) it is a 'person' within the meaning of the statute; (2) the [plaintiff's] claims are based upon the [removing party's] conduct 'acting under' the United States, its agencies, or its officers; (3) the [plaintiff's] claims against it are 'for, or relating to' an act under color of federal office; and (4) it raises a colorable federal defense to the [plaintiff's] claims." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d at 467.

### ii. Analysis

I apply the *Commonwealth* requirements, all of which must be satisfied to justify removal and require denial of remand on the basis of 28 U.S.C. § 1442.

Requirement 1 is not an issue. Plaintiffs do not contest that Defendants are "persons" within the meaning of Section 1442.

Requirement 2, however—that Defendants were "acting under" a federal officer or agency—is not met.

To establish that it was "acting under" a federal officer within the meaning of section 1442(a)(1), the private actor defendant must demonstrate that it performed the complained-of activity at the direction of a federal authority. *Willingham v. Morgan*, 395 U.S. 402, 409 (1969). In *Watson*, the Supreme Court acknowledged that the removal statute applies to private persons who lawfully assist a federal officer in the performance of his or her official duty. To fall under the scope of the statute, however, a private person must do more than "simply [comply] with the law." 551 U.S. at 151–52. Thus even a "highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone." *Id.* at 153. To satisfy the requirement of "acting under" a government agency, a private actor must perform "a job that, in the absence of a contract with a private firm, the government itself would have had to perform." *Id.* at 154.

Here, the only connection to the federal government is that Defendants—owners and operators of privately owned nursing facilities—are required to comply with detailed federal regulations when operating these facilities and when providing care. (DE 8 at 26–32) Defendants state that, by providing medical treatment for patients, complying with Medicare and Medicaid regulations, and therefore receiving Medicare and Medicaid payments from the federal government, they were assisting a federal officer in the performance of an official duty. (*Id.* at 26–28) They add that federal guidelines required them to implement measures to limit the spread of COVID-19, guidelines which they did not violate. (*Id.* at 28-32) These allegations of compliance with federal law, even in a regulated setting, are insufficient to establish that Defendants were "acting under" a federal officer or agency. *See, e.g.*, *Mennonite Gen. Hosp., Inc. v. Molina Healthcare of Puerto Rico*, 319 F. Supp. 3d 587, 595 (D.P.R. 2018)("With respect to their involvement in the Medicaid program, Defendants are certainly subject to detailed federal regulations and they may even be 'highly supervised and monitored.' *Watson*, 551 U.S. at 153, 127 S.Ct. 2301. But beyond that, Defendants have not shown anything to indicate that they 'assist, or to help carry out, the duties or tasks of the federal superior.'").

Defendants' line of reasoning would have very far-reaching consequences. Consider, for example, that during this pandemic many private persons or entities have received federal funds under the CARES act and its Paycheck Protection Program ("PPP"), and may point to their dutiful compliance with CDC guidelines for limiting occupancy, face coverings, and health and sterilization measures. Small and large entities alike, including nonprofits, restaurants, vineyards, construction companies, and religious organizations, have accepted such funding, all while attempting to implement measures to curb the spread of COVID-19. *See* https://home.treasury.gov/policy-issues/cares-act/assistance-for-small-businesses/sba-paycheck-protection-program-loan-level-data. Under Defendants' line of reasoning, all of these entities would be acting under a federal officer for purposes of § 1442(a)(1).

*Watson* stands in the way of any interpretation that all of those persons and entities are, or are acting on behalf of, federal agents. I believe it is impermissible to read Section 1442 so broadly.

Even assuming that requirements 1 and 2 are both met, however, Defendants have requirement 3 to deal with. Defendants fail to establish that the acts alleged by Plaintiffs to be negligent were performed pursuant to the direct orders of a federal officer. Removal under § 1442(a)(1) "'must be predicated upon a showing that the acts forming the basis of the state suit were performed pursuant to an officer's direct orders or comprehensive and detailed regulations.'" *Orthopedic Specialists of N.J. PA v. Horizon Blue Cross/Blue Shield of N.J.*, 518 F. Supp. 2d 128, 135-36 (D.N.J. 2007) (emphasis added) (quoting *N.J. Dep't of Envtl. Prot. v. Dixo Co.*, No. CV 06–1041–SRC, 2006 WL 2716092, at *2 (D.N.J. Sept. 22, 2006)). A private party must also demonstrate that the federal officer had "direct and detailed control" over the action in question. *Id.* at 134 (internal quotation marks omitted). Put another way,

> Removal must be predicated upon a showing that the acts forming the basis of the state suit were performed pursuant to an officer's direct orders or comprehensive and detailed regulations. By contrast, if the corporation establishes only that the relevant acts occurred under the general auspices of federal direction then it is not entitled to § 1442(a)(1) removal.

*Dixo*, 2006 WL 2716092, at *2 (citing *Good v. Armstrong World Indus., Inc.*, 914 F.Supp. 1125, 1128 (E.D. Pa. 1996)). Here, Plaintiffs allege negligence stemming from the medical care they received while patients and residents at Defendants' facilities. Defendants do not contend that the purportedly negligent medical care administered was under the direct and detailed control of a federal agency or officer. Rather, Defendants generally contend that there is a nexus between Plaintiffs' negligence claims and the infection control procedures they followed as part of the federal government's nationwide COVID-19 response. (6605 Action, DE 8 at 8) This statement falls short of establishing that the federal government, either by command or comprehensive

regulations, directed and controlled the specific conduct that caused Plaintiffs' injuries.

Defendants do not qualify as federal officers or as entities acting under a federal officer. Thus, removal is improper under 42 U.S.C. § 1442(a)(1).

### III.   Conclusion

For the reasons set forth above, I find that this matter was not properly removed because the complaints fail to set forth a basis for this Court's subject matter jurisdiction. The matters will be remanded to New Jersey Superior Court, Sussex County. An appropriate order accompanies this Opinion.

Dated: August 12, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**